DISTRICT COURT
DENVER COUNTY

1437 Bannock Street
Denver, CO  80202

Plaintiffs:

BRYAN L. FRIBERG, SR. and JANET R. FRIBERG

Defendants:

OCWEN LOAN SERVICING, LLC and U.S. BANK,
NATIONAL ASSOCIATION, AS TRUSTEE FOR
RASC 2005 KS11

Ian T. Hicks, Atty. Reg. No. 39332
The Law Office of Ian T. Hicks LLC
6000 East Evans Ave, Bldg 1 Suite 140
Denver, CO  80222
Telephone:  (720) 216-1511
Facsimile:  (303) 648-4169
E-mail: ian@ithlaw.com

▲ COURT USE ONLY ▲

Case Number:

Division:

## COMPLAINT AND JURY DEMAND

Plaintiffs, Bryan L. Friberg Sr. ("Bryan") and Janet R. Friberg ("Janet"), by and through their undersigned counsel, The Law Office of Ian T. Hicks LLC, hereby respectfully submit their Complaint and Jury Demand against Ocwen Loan Servicing, LLC ("Ocwen") and U.S. Bank, National Association, as Trustee for RASC 2005 KS11 ("U.S. Bank"), and in support thereof, state as follows:

**EXHIBIT**

A

## I. NATURE OF THE CASE

1.     "Owning a home of one's own has always epitomized the American dream. More than simply embodying the notion of having 'one's castle,' it represents the sense of freedom and self-determination emblematic of our national character."[1]

2.     The Plaintiffs in this action—a decorated and fully-disabled combat veteran who suffers from severe post-traumatic stress disorder ("PTSD") and his wife, who works as a nurse—are yet another in a long line of homeowners who have had their American dream transformed into a nightmare by the reckless actions of a frequently-sanctioned loan servicer, Ocwen.

3.     Through a pattern of misrepresentations, self-contradiction, and inexplicable misconduct, Ocwen has managed to frustrate the Plaintiffs, for years, and concurrently violate nearly every significant state and federal consumer-protection law relating to mortgage servicing. Plaintiffs bring common-law and statutory claims against Ocwen, and in connection therewith, seek both monetary damages and equitable relief.

## II. PARTIES

4.     Bryan is a resident of Colorado, and his home has a physical address of 27547 County Road 18, Keenesburg, Colorado, 80643 (the "Property"). Bryan has resided at the Property since at least July of 2005.

5.     Bryan was deployed to Iraq during Operation Iraqi Freedom as a Major in the United States Army. Bryan was warded the Armed Forces Reserve Medal with "M" Device, Iraq Campaign Medal with Two Campaign Stars, Meritorious Service Medal, Joint Service

---

[1] *Nahrstedt v. Lakeside Village Condominium Assn.*, 8 Cal. 4th 361, 396, 878 P.2d 1275, 1296 (1994) (Arabian, J.).

Commendation Medal, Army Commendation Medal, Army Achievement Medal, and the Army Reserve Component Medal.

6.      Bryan was honorably discharged from the U.S. Army on or about February 18, 2014, after 30 years of service. As a result of serving two combat tours in the middle east, at the time of his honorable discharge he was adjudged to be fully, 100% disabled by the U.S. Army. As a result of his service overseas, during combat operations, Bryan suffers from severe Post-Traumatic Stress Disorder (PTSD). Ocwen was aware of these facts at all times material to this action.

7.      Janet is Bryan's wife, and has resided with him at the Property since at least July of 2005. Janet has been licensed and has worked as a registered nurse in the state of Colorado since July of 2006.

8.      Ocwen is limited liability company, formed and existing under the laws of the state of Delaware. Ocwen specializes in servicing subprime and delinquent residential mortgage loans. Ocwen's principal office is located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida, 33409. Ocwen has been the servicer of Plaintiffs' mortgage loan, which was used to purchase the Property, since August 5, 2013.

9.      U.S. Bank is the trustee and investor for the securitization trust that owns the repayment obligation reflected by the Loan, and has been since at least November 17, 2008. U.S. Bank was formed and exists under the laws of the state of Minnesota. U.S. Bank's principal office is located at 60 Livingston Avenue, St. Paul, Minnesota, 55107. Ocwen, as the servicer, is the agent of U.S. Bank to service Plaintiffs' loan on behalf of and for the benefit of itself and U.S. Bank.

### III.    JURISDICTION AND VENUE

10.    This Court has general subject-matter jurisdiction pursuant to Article VI, Section 9 of the Colorado Constitution, and therefore is authorized to adjudicate this controversy.

11.    Under C.R.S. § 13-1-124(1)(a)-(b) and the Due Process Clause of the Fourteenth Amendment, this Court has personal jurisdiction against Ocwen and U.S. Bank arising from the continuous and systematic operation of their businesses in this state as the servicer and investor, respectively, on at least dozens of loans secured by deeds of trust recorded against Colorado properties. Further, this Court has personal jurisdiction because the events giving rise to this action occurred in Colorado.

12.    Venue is property in this Court pursuant to C.R.C.P. 98(c)(1) because Ocwen and U.S. Bank are nonresidents of Colorado and were found in Denver County at the commencement of this action through the operation of their businesses.

### IV.    GENERAL ALLEGATIONS

**A.    History of Plaintiffs' Loan Origination and Subsequent Servicing Transfers**

13.    On or about July 25, 2005, Plaintiffs obtained a mortgage loan from New Century Mortgage Corporation ("New Century") in the amount of $276,250.00 (the "Loan"), which was evidenced by a promissory note ("Note") and secured by a deed of trust ("DOT") recorded against the Property in the property records of Weld County, Colorado, at reception number 3310057.

14.    At the time the Plaintiffs' loan was originated, New Century was the second-largest subprime lender in the United States, having originated $56.1 billion dollars' worth of subprime

loans in the year 2005 alone. Yet, within 2 years, New Century's fortunes suffered a startling reversal, and thus became a lynchpin for the subprime financial crisis of 2007.

15.     On April 2, 2007, under the weight of increasing scrutiny of its loan-origination practices from the Department of Justice, the Federal Trade Commission, and a litany of settlements with and investigations by agencies at the state level relating to those practices, New Century filed for bankruptcy under Chapter 11 of the Bankruptcy Code.

16.     On December 7, 2009, three former officers of New Century, including former CEO and President Brad Morrice, reached a consent decree with the Securities and Exchange Commission that required the payment of millions of dollars in penalties and stipulating to injunction barring each of them from serving as officers of a publicly-traded company. Less than a year later, thirteen former officers and directors of New Century agreed to pay $90 million dollars to settle outstanding claims stemming from its collapse.

17.     After origination by New Century, servicing of the Loan was transferred from New Century Mortgage Corporation to Homecomings Financial LLC ("Homecomings"). Homecomings was formed by General Motors Acceptance Corporation ("GMAC") in 1995 from the assets of another company. In 2005, ownership of Homecomings was transferred to a newly-formed holding company, GMAC's Residential Capital Corporation ("ResCap"), an entity created by GMAC to cabin off liability for Homecomings' deficient loan-servicing and origination practices.

18.     In what would become a familiar refrain in the subprime mortgage industry, Homecomings' life was brief, but highly troubled. On January 22, 2009, the Federal Trade Commission issued a closing letter indicating that the Commission had uncovered evidence,

5

including but not limited to analysis of loan-origination data provided by Homecomings, had engaged in systemic violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691-1691f ("ECOA"), and the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq.* The investigation was closed only because of Homecomings' assurances that it would immediately cease originating loans nationwide.

19.     A month prior, the Department of Justice resolved an investigation into Homecomings' systemic violations of the Servicemembers' Civil Relief Act ("SCRA"), 50 U.S.C. § 501, *et seq.*, which required Homecomings to adjust its servicing practices nationwide by waiving prepayment penalties for properties obtained and later sold by active duty servicemembers. Throughout its existence, Homecomings settled a broad array of investigations by state agencies and class-action lawsuits relating to its deficient servicing practices, involving everything from illegal kickback schemes to misapplication of payments.

20.     On March 14, 2012, the Department of Justice and attorneys general of Colorado and 48 other states filed a consent judgment ("Judgment") in the United States District Court for the District of Columbia to resolve claims that ResCap, Ally Financial, Inc. ("Ally"), and GMAC, had methodically, for years, violated a wide spectrum of state and federal consumer-laws as a result of its illegal servicing practices, on a national level, as part of the National Mortgage Settlement ("NMS").

21.     The Judgment was the result of foreclosure-prevention efforts that began in 2007 by the state attorneys general, including Colorado, and state banking regulators to stem the rising tide of foreclosures, and ultimately transformed into an extensive investigation of illegal servicing practices by ResCap, Ally, GMAC, and others, starting in 2010. The years-long investigation

involved the state attorneys general, state banking regulators, the Department of Justice, the Treasury Department, and the Department of Housing and Urban Development.

22.     That investigation uncovered substantial evidence of illegal servicing practices by ResCap, Ally, and GMAC. Those illegal servicing practices included, but were not limited to (1) failing to timely and accurately apply payments made by borrowers; (2) failing to maintain accurate account statements for borrowers; (3) failing to maintain appropriate staffing, training, and quality control systems; (4) charging excessive or improper fees in connection with alleged defaults on loans; (5) providing borrowers with false or misleading information in response to borrower complaints; and (6) engaging in false, misleading, and deceptive practices in the offering of loss mitigation alternatives to foreclosure.

23.     Although not making a formal admission of liability, ResCap, Ally, and GMAC agreed to the following reforms, among others: (1) pay, directly or indirectly through loan modification or other relief, over $2 billion dollars to borrowers aggrieved by their illegal servicing practices; (2) completely overhaul their servicing practices, including but not limited to staffing levels, training, record-keeping, payment processing, and loss mitigation procedures; (3) the enactment of new, binding servicing standards to ensure compliance with state and federal consumer-protection laws; and (4) the appointment of an independent, third-party monitors to ensure compliance with those new servicing rules and standards.

24.     Colorado borrowers were subjected to the illegal servicing practices described herein, and Colorado received payments totaling $50,170,188.00 from the servicers and banks subject to the Judgment, including but not limited to ResCap, Ally, and GMAC.

7

25.     Yet again, just as the ink was barely dry on the Judgment, the Loan was swept into the morass of yet another bankruptcy. Specifically, on May 14, 2012, ResCap, along with 51 of its subsidiary origination and servicing entities, simultaneously filed 52 separate voluntary petitions under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. ResCap and its related entities listed $15.7 billion dollars in assets and $15.3 billion dollars in debt, along with over $100 billion in potential claims, making it both in terms of value and complexity, one of the largest bankruptcies in U.S. history.

26.     During the ResCap bankruptcy case, in late 2012, Ocwen agreed to pay $3 billion dollars to acquire ResCap's mortgage servicing operations, which covered 2.4 million home loans with a balance of approximately $374 billion dollars. Thus, yet again, the servicing of Plaintiffs' loan was transferred from one defunct servicer with a notorious record of legal violations to another, currently-existing entity with a similarly dismal history of violating the rights of its borrowers, Ocwen. Ocwen began servicing the Loan on or about August 5, 2013.

27.     As part of its purchase of ResCap's mortgage servicing operations, Ocwen agreed to be bound by all aspects of the Judgment that had been entered into by ResCap, Ally, and GMAC, as it related to the loans that were part of the ResCap portfolio, including Plaintiffs' Loan referenced herein.

28.     After an extensive, nationwide investigation involving banking and regulatory authorities at the state and federal level, on February 26, 2014, the Consumer Financial Protection Bureau ("CFPB") and the attorneys general of 49 states, including Colorado, filed a consent judgment (the "Ocwen Judgment") in the United States District Court for the District of Columbia to resolve claims that Ocwen had methodically, for years, violated a wide spectrum of state and

federal consumer-protection laws as a result of its illegal servicing practices, which the CFPB described as "years of systemic misconduct at every stage of the mortgage servicing process."

29.     Although not making any formal admission of liability, as part of the Ocwen Judgment Ocwen agreed to the following reforms, among others: (1) pay, directly or indirectly through loan modification or other relief, over $2 billion dollars in principal reductions to borrowers aggrieved by their illegal servicing practices; (2) provide $125 million in refunds to foreclosure victims; (3) completely overhaul their servicing practices, including but not limited to staffing levels, training, record-keeping, payment processing, and loss mitigation procedures; (4) the enactment of new, binding servicing standards to ensure compliance with state and federal consumer-protection laws; and (5) the appointment of an independent, third-party monitors to ensure compliance with those new servicing rules and standards, which mirror the servicing rules and standards that became part of the NMS.

30.     Colorado borrowers were subjected to the illegal servicing practices described herein, and under the Ocwen Judgment, through the third quarter of 2015, Ocwen provided those borrowers relief with a total value of $9,265,474.00.

31.     Almost immediately after the Ocwen Judgment was filed, serious issues came to light with its continuing and systematic illegal servicing practices. On October 25, 2015, Joseph A. Smith, the Monitor of the National Mortgage Settlement (the "Monitor") filed a report with the U.S. District Court for the District of Columbia evidencing Ocwen's widespread non-compliance with the servicing standards that it had agreed to follow as part of its purchase of the ResCap servicing portfolio and as part of the Ocwen Judgment.

9

32.    More specifically, in the October 25, 2015 Report, the Monitor indicated that Ocwen had failed 11 separate performance metrics utilized to measure compliance with the new servicing standards in the third and fourth quarters of 2014, respectively. The performance metrics failed included those relating to loss mitigation procedures, loan modification timeline compliance, pre-foreclosure notifications, and the propriety of default-related fees collected or charged against borrowers' accounts.

33.    Many of those failures were attributable Ocwen's pervasive practice of backdating several hundred thousand letters sent to borrowers to loan modifications and other loss-mitigation alternatives, which started as early as the year 2010. By backdating letters to falsely appear as if they had been transmitted more than 30 days before the actual mailing date, Ocwen afforded itself the opportunity to create sham defaults and deny loss-mitigation alternatives to borrowers facing foreclosure.

34.    Indeed, as part of a Consent Order (the "Ocwen Order") entered between Ocwen and the New York Department of Financial Services ("NYDFS") in connection with its illegal backdating of correspondence, Ocwen stipulated and admitted to the following facts:

> 14.    Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. A frequent occurrence is that a fix to one system creates unintended consequences in other systems. As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records. There are insufficient controls in place—either manual or automated—to catch all of these errors and resolve them.
>
> 15.    For example, Ocwen's systems have been backdating letters for years. In many cases, borrowers received a letter denying a mortgage loan modification, and the letter was dated more than 30 days prior to the date that Ocwen mailed the letter. These borrowers were given 30 days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the

backdated letter. In other cases, Ocwen's systems show that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure—and the cure date was months prior to receipt of the letter. Ocwen's processes failed to identify and remedy these errors.

16.    Moreover, Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance. Ocwen ignored the issue for five months until the same employee raised it again. While Ocwen then began efforts to address the backdating issue, its investigation was incomplete and Ocwen has not fully resolved the issue to date, more than a year after its initial discovery.

17.    Ocwen's core servicing functions rely on its inadequate systems.

18.    Despite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans. Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors . . . In some cases, this policy has frustrated struggling borrowers who have complex issues that exceed the bounds of a script and have issues speaking with representatives at Ocwen capable of addressing their concerns. Moreover, Ocwen's customer care representatives in many cases provide conflicting responses to a borrower's question. Representatives have also failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower.

35.    Those stipulations and admissions in the Consent Order, which was executed on December 14, 2014, establish that Ocwen had, for years, willfully operated its business in a reckless manner that in knew would, with a virtual certainty, result in large numbers of borrowers being subjected to, among other indignities, sham payment defaults, the charging of groundless default-related fees and expenses, improper foreclosures, and the emotional distress associated with being forced to navigate a Kafkaesque bureaucracy while desperately trying to save their American dream of home ownership.

**B.    Ocwen's Servicing of the Plaintiffs' Loan after Plaintiffs' Bankruptcy Discharge**

11

36.     On or about September 10, 2008, Plaintiffs filed a Petition under Chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Colorado.

37.     At that time, Homecomings was the servicer of that Loan and U.S. Bank was the investor, which owned the Loan's repayment obligation. U.S. Bank remains the investor as of the date of this filing.

38.     U.S. Bank filed a proof of claim in the Bankruptcy Court claiming to be the creditor for the Loan on November 17, 2008.

39.     Plaintiff's Chapter 13 Plan was first confirmed by the Bankruptcy Court on November 7, 2008. Two subsequent Chapter 13 Plans were confirmed on August 19, 2008 and February 18, 2011, respectively.

40.     On July 27, 2009, U.S. Bank filed a Stipulation in the Bankruptcy Court averring that Plaintiffs owed $4,527.55 in post-petition arrearages on the Loan, and that Plaintiffs had entered an agreement to cure those arrearages by making repayments during the Bankruptcy Case.

41.     On December 2, 2013, the U.S. Trustee filed a Notice with the Bankruptcy Court stating that Plaintiffs had recently completed their final payment to cure $15,434.61 in pre-petition arrearages that were allowed under the Plaintiffs' then-existing Chapter 13 Plan.

42.     Upon receiving the transfer of servicing from on August 5, 2013, Ocwen reported the Loan as delinquent to the credit reporting agencies as a furnisher of information.

43.     Thus, at the time Ocwen began servicing the Loan on August 5, 2013, the Loan was in default, according to Ocwen, U.S. Bank, and the U.S. Trustee.

44.     Plaintiffs received a discharge of their personal obligations on the Loan and in the bankruptcy case as a whole on February 5, 2014.

45.     In late 2014, Plaintiffs sought to refinance the Loan through a third-party mortgage originator. After reviewing Plaintiffs' financial information, they received preliminary approval for a refinance loan that would have reduced their interest rate from 6.0% to a permanent fixed interest rate of 3.5% over 20 years.

46.     However, Plaintiffs were denied the refinance loan solely because Ocwen had failed to properly account for payments received, lost $11,953.53 in surplus funds that it never credited to the Loan, and erroneously assessed a variety of improper default-related fees and expenses, circumstances which were then reflected on Plaintiffs' credit report obtained by the loan originator handling their refinance application.

47.     On or about December 15, 2014, Ocwen transmitted a letter to the Plaintiffs stating that the Loan was in default, allegedly due to Plaintiffs' failure to make payments for the preceding several months.

48.     That December 15, 2014, letter threatened to initiate foreclosure proceedings against the Property due to the alleged failure to make payments for several months.

49.     Plaintiffs, however, actually made all of those payments, and had documentary proof that the payments were made and received by Ocwen.

50.     Mr. Friberg repeatedly contacted Ocwen in a fruitless effort to obtain a rational explanation for the discrepancy between reality and Ocwen's inaccurate accounting records.

51.     During these communications and others, Mr. Friberg repeatedly notified Ocwen that he suffered from severe PTSD as a result of his combat experiences in the middle east.

52.     Despite his repeated efforts, Ocwen representatives gave Mr. Friberg inconsistent, contradictory, and incomprehensible responses regarding the alleged payment default on the Loan,

13

and Ocwen refused to accept evidence that the allegedly missed payments were made and received by Ocwen.

53.     As a result of its steadfast refusal to properly credit the Loan for payments made and received, Ocwen began imposed a variety of default-related fees and expenses, causing the Loan to spiral exponentially into an irretrievable default.

54.     On January 5, 2015, Ocwen transmitted a monthly statement to Plaintiffs alleging that they were now $7,232.23 in default, even though (a) Ocwen's own records would later demonstrate the existence of an $11,953.53 surplus that it had never applied to the Loan; (b) Plaintiffs had made all of the payments from their discharge date through receipt of the letter; and (c) Plaintiffs had cured of any default on the loan as of the date of their discharge on February 5, 2014.

55.     From that point forward, Ocwen repeatedly sent Plaintiffs monthly statements, delinquency notices, and letters that (a) sought payment of principal and interest amounts that were not actually properly due and owing and had already been paid; (b) sought payment for default-related fees, expenses, and other charges even though no default had actually occurred; and (c) threatened to foreclose on Plaintiffs if they did not agree to pay those amounts.

56.     Despite the absence of any default, and despite Plaintiffs' repeated communications to Ocwen that no default had occurred and their repeated offers to provide evidence demonstrating the absence of any such default, in February of 2015 Ocwen refused to continue accepting Plaintiffs' monthly payments.

57.     Ocwen accomplished bizarre refusal to accept money from Plaintiffs by extinguishing Plaintiffs' online account access and further by eliminating the Loan from the

14

Western Union database, a conduit through which Ocwen had previously accepted payments for over a year.

58.     On March 15, 2015, Ocwen's Office of the Consumer Ombudsman sent a letter to Plaintiffs in response to their repeated and increasingly desperate efforts to get Ocwen to properly account for payments made and amounts due on the Loan.

59.     The letter, which was written in a generalized, script-like manner, failed to specifically address the Plaintiffs' concerns, recited irrelevant historical facts, and merely restated the same erroneous allegations regarding Plaintiffs' alleged default on the Loan.

60.     Included with the letter was a document that purported to be a payment history, which indicated that at the time Ocwen acquired servicing, there was a surplus due to Plaintiffs' extra payments on the Loan in the amount of $11,953.53, an amount that was never properly credited to the Loan, if at all.

61.     The payment history further indicated that from the time it began servicing the Loan, Ocwen had (a) failed to identify payments actually made and received by Ocwen; (b) failed to accurately account for payments that happened to appear in Ocwen's own records; (c) placed payments into and out of suspense accounts at random, for months at a time; and (d) reversed payments for no reason and without explanation.

62.     The letter falsely stated that Plaintiffs had failed to remit their monthly payments for the months of November of 2014 through March of 2015.

63.     The letter admitted that Ocwen had assessed additional fees against the Plaintiffs due to their alleged default on the Loan.

64.     Ocwen claimed that those fees had been assessed against the Plaintiffs because Ocwen itself had incurred fees as a result of Plaintiffs' alleged default.

65.     Ocwen's statement, however, that it had incurred fees because of Plaintiffs' alleged default was false when made for at least two reasons.

66.     First, Plaintiffs were not actually in default, and certainly not for failing to make payments from November of 2014 through March of 2015.

67.     Second, Ocwen did not incur any fees because of Plaintiffs' alleged default, and even if it had, Ocwen's statement was misleading because it created the false impression of a correlation between the amount of fees it had incurred and the amount of fees assessed against the Loan

68.     Throughout the remainder of 2015 and into 2016, repeatedly sent Plaintiffs monthly statements, delinquency notices, and letters that (a) sought payment of principal and interest amounts that were the result of its wrongful failure to properly account for payments actually made and received; (b) sought payment for default-related fees, expenses, and other charges that were inflated, miscalculated, and not properly due and owing; and (c) threatened to foreclose on Plaintiffs if they did not agree to pay those amounts.

69.     During that period of time, Plaintiffs repeatedly contacted Ocwen, in an ever-increasingly desperate attempt to extract themselves from the nightmare their Loan had become, and, despite these efforts, Ocwen representatives gave Plaintiffs inconsistent, contradictory, and incomprehensible responses, and Ocwen refused to accept evidence that the allegedly missed payments were made and received.

70.     Ultimately, Ocwen offered Plaintiffs a modification under the Home Affordable Modification Program ("HAMP"), on August 17, 2016. The HAMP package mailed to Plaintiffs included a HAMP Streamline Approval Notice, which is an explanatory letter attached the proposed HAMP Agreement, which contains the actual, proposed modified terms of the Loan.

71.     However, because the proposed modification was premised upon Ocwen's preexisting accounting mistakes alleged herein, the terms offered failed to provide Plaintiffs with any meaningful relief, contained an assortment of critical errors, and further violated federal guidelines and rules governing HAMP modifications.

72.     the imposition of an outrageous $187,314.64 balloon payment due as a lump sum upon the Loan's maturity date on December 1, 2035.

73.     Most egregious, however, is the fact that the HAMP Agreement was backdated, similar to the tens of thousands of letters and other mailings identified by the NYDFS and the Monitor overseeing compliance under the Consent Judgment and Ocwen Order, respectively.

74.     Under the plain language of the HAMP Agreement—which wasn't even mailed until August 17, 2016—the first modified payment was due on July 1, 2016.

75.     Thus, at the moment of execution, Plaintiffs would have automatically in default under the HAMP Agreement for submitting a late payment—even if that payment had been submitted immediately, on the same day.

76.     Ocwen was repeatedly made informed of Mr. Friberg's precarious emotional and psychological condition as a result of his combat-related PTSD.

77.     The Fribergs have suffered significant emotional distress as a result of Ocwen's misconduct. Janet repeatedly woke up at night with panic attacks worrying about losing her home,

17

and was unable to go back to sleep as a result of waking up with an elevated heart rate. That lost sleep had a ripple effect throughout her days, impacted her work, and has led to a consistent pattern of fear and stress. Bryan suffers from PTSD, and has suffered from lost sleep, loss of appetite, overwhelming anxiety, and an inability to receive treatment for his PTSD, according to the mental health professionals he has been receiving treatment from.

78.     As the servicer of tens of thousands of home loans, Ocwen was acutely aware of the venerated position that the concept of home ownership occupies in American society, and the consequent emotional bond that a typical borrower shares with his or her home.

79.     For the same reason, Ocwen was also acutely aware that the home almost always represents a typical borrower's largest expenditure and their most important investment, upon which their entire financial well-being depends.

80.     It was therefore obvious that, like the many thousands of typical homeowners that Ocwen deals with on a daily basis, Plaintiffs' financial and emotional connection to the Property was such that any material errors in servicing the Loan would almost certainly cause Plaintiffs to suffer severe emotional distress and mental anguish.

81.     Despite the knowledge of that risk, and its awareness of the fact that it had committed a large number of material errors in servicing the Loan, Ocwen nevertheless refused to correct its mistakes despite ample opportunity to do so.

82.     Most intolerable is the fact that what happened to the Plaintiffs in this action is not an isolated incident, but instead the altogether predictable result of Ocwen's conscious decision to undertake the delicate and sensitive business of loan servicing for residential homes, across

18

America, and do so using incompatible computer systems and programs, grossly inadequate sufficient levels of staffing or training, and no legitimate means of ensuring quality control.

83.     The predictable outcome that Ocwen risked with thousands of its customers unfortunately became a stark reality for the Plaintiffs.

84.     Mr. Friberg, already diagnosed as 100% disabled as a result of his two tours of duty in the Middle East, and suffering from severe PTSD, has encountered severe emotional distress as a result of Ocwen's misconduct.

85.     Indeed, the severity of the stress of losing the one thing that got him through two deployments—his home—as prevented him from receiving effective treatment for his PTSD, according to the mental health professionals employed by the Veterans Administration.

86.     Mrs. Friberg, for her part, has suffered tremendous emotional distress after being faced with the specter of losing the home that kept her family together during her husband's military service overseas.

87.     Plaintiffs have been unable to rent a dwelling on the Property due to the uncertainty created by Ocwen's repeated and improper threats to foreclose, because Plaintiffs could not enter into an lease agreement with a third party knowing that Ocwen was threatening to foreclose, which would potentially cause the lessee to be evicted from the Property.

88.     Plaintiffs have lost the opportunity to obtain a refinance of the Loan due to Ocwen's repeated servicing errors, which have created a false impression that Plaintiffs defaulted due to a personal choice and are thus untrustworthy.

89.     After Plaintiffs retained counsel, in late 2016, a second payment history was produced by Ocwen.  That payment history showed that for at least eight months after Plaintiffs

received a discharge in their bankruptcy case, Ocwen continued to improperly place their monthly payments into a bankruptcy suspense account and treat their loan as in default despite the fact that during that time period timely and complete payments had been made.

90.      U.S. Bank, in addition to identifying itself as the creditor on the Loan during Plaintiffs' Chapter 13 bankruptcy, was also listed as the entity who commenced a foreclosure in 2016 in Weld County on the Loan.  Ocwen's servicing errors led to the sham default used as support for commencement of the 2016 foreclosure.

91.      Ocwen is the servicer of the Loan under a Pooling and Servicing Agreement, and other express contracts, executed between itself and U.S. Bank or the agents acting on behalf of U.S. Bank.

92.      Under those express contracts, Ocwen agreed, as servicer, to act as the day to day manager on the Plaintiffs' Loan and other loans subject to those express contracts, which generally involves managing payment processing, loss mitigation, interfacing with borrowers, and all other ancillary activities necessary to ensure the management of those loans as performing, revenue-generating assets, and as such, U.S. Bank is vicariously liable for the acts and omissions alleged herein.

## V.      CLAIMS FOR RELIEF

### First Claim for Relief - Violation of Regulation Z of TILA
### 15 U.S.C. §§ 1639-1640(a) and 12 C.F.R. 1026.36(c)(1)(i)
### (Plaintiffs against Ocwen and U.S. Bank)

93.      Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

94.     The Loan qualifies as a consumer credit transaction secured by Plaintiffs' principal dwelling under 12 C.F.R. 1026.36(c)(1).

95.     Ocwen qualifies as a servicer and its management of the Loan qualifies as servicing under 12 C.F.R. 1026.36(c).

96.     From at least August 13, 2013 through the present, Ocwen received numerous periodic payments from the Plaintiffs, but has, throughout that period of time, failed to credit the account on the date of receipt, in violation of 12 C.F.R. § 1026.36(c)(1)(i) and 15 U.S.C. §§ 1639-1640.

97.     Plaintiffs suffered actual damages, including but not limited to (a) being forced to forgo a refinance loan with more favorable terms; (b) being forced to choose between losing their home, along with all the money paid towards the Loan since origination, and accepting a proposed modification that includes less favorable terms than the original Loan; (c) incurring substantial fees, costs, and other financial penalties resulting from Ocwen's erroneous accounting; (d) lost rental income for a second dwelling on the Property; (e), as to Mr. Friberg, extreme emotional distress exacerbated by his severe PTSD; and (f) as to Mrs. Friberg, extreme emotional distress as alleged herein.

98.     Plaintiffs have also suffered statutory damages and seek their attorneys' fees and costs incurred in prosecuting this action.

99.     U.S. Bank qualifies as a creditor under 15 U.S.C. § 1640, and given that Ocwen was acting as its servicing agent with respect to servicing the Loan, it is vicariously liable for any errors committed by Ocwen in that capacity that caused Plaintiffs to incur injuries, damages, or losses.

**Second Claim for Relief - Violation of Regulation Z of TILA**
**15 U.S.C. §§ 1640(a) and 12 C.F.R. 1026.36(c)(1)(ii)(B)**
**(Plaintiffs against Ocwen and U.S. Bank)**

100.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

101.     The Loan qualifies as a consumer credit transaction secured by Plaintiffs' principal dwelling under 12 C.F.R. 1026.36(c)(1).

102.     Ocwen qualifies as a servicer and its management of the Loan qualifies as servicing under 12 C.F.R. 1026.36(c).

103.     In addition to or in the alternative to the First Claim for Relief, from at least August 13, 2013 through the present, to the extent that Ocwen received partial payments from the Plaintiffs, its failure to treat such partial payments as periodic payments upon accumulation of sufficient funds from those partial payments to cover a period payment constitutes a violation of 12 C.F.R. § 1026.36(c)(1)(ii)(B) and 15 U.S.C. §§ 1639-1640.

104.     Plaintiffs suffered actual damages, including but not limited to (a) being forced to forgo a refinance loan with more favorable terms; (b) being forced to choose between losing their home, along with all the money paid towards the Loan since origination, and accepting a proposed modification that includes less favorable terms than the original Loan; (c) incurring substantial fees, costs, and other financial penalties resulting from Ocwen's erroneous accounting; (d) lost rental income for a second dwelling on the Property; (e), as to Mr. Friberg, extreme emotional

22

distress exacerbated by his severe PTSD; and (f) as to Mrs. Friberg, extreme emotional distress as alleged herein.

105.    Plaintiffs have also suffered statutory damages and seek their attorneys' fees and costs incurred in prosecuting this action.

106.    U.S. Bank qualifies as a creditor under 15 U.S.C. § 1640, and given that Ocwen was acting as its servicing agent with respect to servicing the Loan, it is vicariously liable for any errors committed by Ocwen in that capacity that caused Plaintiffs to incur injuries, damages, or losses.

### Third Claim for Relief -Violation of FDCPA
### 15 U.S.C. § 1692e(2)(A), (8), and (10)
### (Plaintiffs against Ocwen and U.S. Bank)

107.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

108.    Ocwen is one of the largest loan servicers in the United States, with a present portfolio of approximately 1.5 million loans.

109.    As a servicer, Ocwen's business involves interfacing with borrowers, collecting and receiving payments from those borrowers, applying those payments to the borrowers' account, and generally managing the loan as a performing asset.

110.    Ocwen does not own the vast majority of loans that it services, but instead acts as an agent on behalf of a third-party, the investor, who owns the loan and the ultimate right to the repayment obligation under the loan.

111.    Thus, as a regular part of its activities, Ocwen utilizes instrumentalities of interstate commerce or the mails in its business, the principal purpose of which is the collection of debts, or

the regular collection or attempts at collection, directly or indirectly, of debts owed or due to or asserted to be owed or due another.

112.    Furthermore, at the time Ocwen began servicing the Loan, it was asserted to be in default by U.S. Bank, Ocwen's principal, and the U.S. Trustee.

113.    Ocwen therefore qualifies as a debt collector under 15 U.S.C. §1692a(6)(F)(iii).

114.    Since Ocwen began servicing the Loan, it (a) has failed to apply payments made by the Plaintiffs to the account; (b) lost $11,953.53 in surplus funds that it never credited to the Loan; (c) failed to identify payments actually made and received by Ocwen; (d) placed payments into and out of suspense accounts at random, for months at a time, causing the Loan to appear as if it were in default when Ocwen had the money the entire time; and (e) reversed payments for no reason and without explanation, further causing the Loan to erroneously appear as if it were in default.

115.    Since Ocwen began servicing the Loan, and through to the present, as a result of the servicing errors alleged herein and including the preceding paragraph, it has transmitted monthly statements, delinquency notices, and letters that (a) sought payment of principal and interest in the wrong amounts; (b) sought payment for default-related fees, expenses, and other charges that were inflated, miscalculated, and not properly due and owing due; (c) threatened to foreclose on Plaintiffs if they did not agree to pay those amounts and actually commenced a foreclosure in 2016; and (d) offered Plaintiffs a modification agreement that sought repayment of the Loan under terms that were the result of their servicing errors.

116.    Accordingly, Ocwen made numerous false representations regarding the character, amount, or legal status of the debt in violation of 15 U.S.C. § 1692e(2)(A) and for the same reasons

used false representations or deceptive means to collect or attempt to collect on the Loan in violation of 15 U.S.C. § 1692e(10).

117. Moreover, Ocwen repeatedly communicated or threatened to communicate to other persons, such as other mortgage loan originators, lenders, credit reporting agencies, and U.S. Bank, credit information that it knew or should have known was false, in violation of 15 U.S.C. § 1692e(8), including but not limited to the failure to note that the debt was disputed by Plaintiffs, both directly by them and through their prior counsel on multiple occasions, such as when they notified Ocwen of its servicing errors alleged herein in writing and orally.

118. Ocwen knew or should have known the credit information that it communicated or threatened to communicate was false for several reasons, including but not limited to the fact that (a) the information demonstrating falsity was contained within its own records; (b) Ocwen knew or should have known that it relied upon incompatible computer systems and programs, grossly inadequate sufficient levels of staffing or training, and records that it was aware were routinely inaccurate; and (c) Plaintiffs offered to provide the information that would have clarified the falsity of that credit information.

119. Ocwen's violations of the Fair Debt Collection Practices Act caused Plaintiffs to suffer actual damages, including but not limited to (a) being forced to forgo a refinance loan with more favorable terms; (b) being forced to choose between losing their home, along with all the money paid towards the Loan since origination, and accepting a proposed modification that includes less favorable terms than the original Loan; (c) incurring substantial fees, costs, and other financial penalties resulting from Ocwen's erroneous accounting; (d) lost rental income for a

second dwelling on the Property; (e) as to Mr. Friberg, extreme emotional distress exacerbated by

his severe PTSD; and (f) as to Mrs. Friberg, extreme emotional distress as alleged herein.

120.  Plaintiffs have also suffered statutory damages and seek their attorneys' fees and

costs incurred in prosecuting this action.

**Fourth Claim for Relief**
**Violation of the Colorado Consumer Protection Act**
**C.R.S. § 6-1-101, *et seq.***
**(Plaintiffs Against Ocwen and U.S. Bank)**

121.  Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

herein.

122.  Ocwen engaged in numerous deceptive trade practices based on the servicing errors

alleged herein, including (a) violation of C.R.S. § 12-14-107(1)(b)(I), (i), and (k) as alleged as

distinct claims herein; (b) the violation of C.R.S. § 38-40-103(1)(a)(I) alleged as a distinct claim

herein; (c) the breaches of contract and duties of good faith and fair dealing, respectively, alleged

as distinct claims for relief herein; and (d) violations of C.R.S. § 6-1-105(1)(g).

123.  Under C.R.S. § 6-1-105(1)(g), it is an unlawful or deceptive trade practice for a

person to "[r]epresent[] that goods, food, services, or property are of a particular standard, quality,

or grade, or that goods are of a particular style or model, if he knows or should know that they are

of another."

124.  Here, Ocwen violated this provision when it expressly and impliedly represented

to Plaintiffs—such as by transmitting monthly statements and other communications that

purported to state true facts about the amounts due on the Loan—from the time it began servicing

the Loan through to the present that it had the systems, programs, training, staffing and quality

control measures in place to (a) maintain accurate records; (b) properly track and apply payments;

26

(c) ensure that its communications contained correct information; (d) avoid sham defaults on the loans it serviced; and (e) reasonably communicate with borrowers to resolve routine disputes or difficulties that arose with respect to the loans that it serviced.

125.     Ocwen knew or should have known that the representations were false, because, as Ocwen has itself admitted in the Consent Order, (a) its information technology systems are a patchwork of incompatible systems, which result in Ocwen "regularly giv[ing] incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records"; (b) those system-related difficulties have caused Ocwen to "backdate[d] letters for years"; (c) "Ocwen's core servicing functions rely on its inadequate systems"; (d) "Ocwen continues to rely on those [inadequate] systems to service its portfolio of distressed loans," which causes "in many cases" an Ocwen representative to give a borrower conflicting or inaccurate information.

126.     Ocwen also knew or should have known the representations were false because, as alleged by the CFPB after an extensive investigation of Ocwen's servicing activities prior to Ocwen entering into the Ocwen Judgment, Ocwen had engaged in "years of systemic misconduct at every stage of the mortgage servicing process." Although Ocwen formally denied liability in the Ocwen Judgment, it is plausible to assume that it would not have agreed to billions of dollars in penalties, fines, and other equivalent sanctions as well as a complete overhaul and long-term monitoring of its servicing activities unless the CFPB's description was reasonably accurate. In addition, the Monitor overseeing compliance with the Ocwen Judgment and Consent Judgment identified numerous and systemic failures in Ocwen's servicing operations.

127.    The deceptive trade practices described significantly impacted the public as actual or potential consumers of Ocwen's goods and services.  Ocwen was, and continues to be, one of the largest loan services in America, and services at least hundreds of loans in the state of Colorado. The systemic nature of Ocwen's internal system, staffing, quality-control, and training deficiencies indicates that the deceptive trade practices, each of which concern frequently-recurring and core servicing activities such as tracking payments, would have affected a large number of borrowers in the state of Colorado.

128.    Moreover, under both the Ocwen Judgment and Consent Judgment, Ocwen agreed to tens of millions of dollars in penalties, fines, and other equivalent sanctions payable directly to Colorado, which further demonstrates that Ocwen engaged in the misconduct that gave rise to the Ocwen Judgment and Consent Judgment as to a large number of borrowers in Colorado.

129.    Plaintiffs were actual or potential consumers of Ocwen's goods or services because since August 5, 2013, Ocwen has been the servicer for the Loan.

130.    The deceptive trade practices alleged caused Plaintiffs actual damages or losses, as more specifically alleged in the distinct claims herein identifying (a) violation of C.R.S. 12-14-107(1)(b)(I), (i), and (k) as alleged as distinct claims herein; (b) the violation of C.R.S. § 38-40-103(1)(a)(I) alleged as a distinct claim herein; and (c) the breaches of contract and duties of good faith and fair dealing, respectively.

131.    The deceptive trade practices also caused Plaintiffs actual damages or losses as a consequence of Ocwen's deceptive trade practice under C.R.S. § 6-1-105(1)(g), in the form of (a) being forced to forgo a refinance loan with more favorable terms; (b) being forced to choose between losing their home, along with all the money paid towards the Loan since origination, and

accepting a proposed modification that includes less favorable terms than the original Loan; (c)

incurring substantial fees, costs, and other financial penalties resulting from Ocwen's erroneous

accounting; (d) lost rental income for a second dwelling on the Property; (e) as to Mr. Friberg,

extreme emotional distress exacerbated by his severe PTSD; and (f) as to Mrs. Friberg, extreme

emotional distress resulting from the fear of losing her home.

**Fifth Claim for Relief – Violation of CFDCPA**
**C.R.S. § 12-14-107(1)(b)(I), (i), and (k)**
**(Plaintiffs against Ocwen and U.S. Bank)**

132.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

herein.

133.   For the reasons alleged in paragraphs 108-113, Ocwen qualifies as a collection

agency under C.R.S. § 12-14-103(2)(a)(II) and (b)(III).

134.   For the reasons alleged in paragraphs 114-115, Ocwen engaged in conduct that

constitutes a violation of C.R.S. § 12-14-107(1)(b)(I) and (k).

135.   For the reasons alleged in paragraphs 117-118, Ocwen engaged in conduct that

constitutes a violation of C.R.S. § 12-14-107(i).

136.   For the reasons alleged in paragraphs 119-120, Plaintiffs have suffered actual and

statutory damages, and seek their attorneys' fees and costs incurred in prosecuting this action.

**Sixth Claim for Relief – Violation of C.R.S. § 38-40-103(1)(a)(i)**
**(Plaintiffs Against Ocwen and U.S. Bank)**

137.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

herein.

138.    For the reasons stated in paragraphs 108-111 and 95, Ocwen is a person who regularly engages in the collection of payments on mortgages and deeds of trust for owners of evidences of debt secured by mortgages or deeds of trust.

139.    Ocwen thus had a duty to promptly credit all payments which were received and which were required to be accepted under 12 C.F.R. 1026.36(c)(1)(i) and (ii)(B), sections 1-2 of the DOT, and sections 3, 7, and 9 of the Note.

140.    For the reasons stated in 96, 103, and 114, Ocwen breached its duty to promptly credit all payments which were required to be accepted 12 C.F.R. 1026.36(c)(1)(i) and (ii)(B), sections 1-2 of the DOT, and sections 3, 7, and 9 of the Note.

141.    Plaintiffs and their former counsel, through phone calls, emails, and letters repeatedly attempted, at least 10 times, to remedy the violations by explaining to Ocwen its mistakes and offering to provide clarifying information.

142.    Ocwen failed to remedy the violations in a reasonable, timely, and good faith manner, and has continued even as of this filing to refuse to remedy its violations.

143.    For the reasons stated in paragraphs 97, 104, and 119, Plaintiffs have suffered actual damages, and further seek statutory damages and attorneys' fees under C.R.S. § 38-40-104(1).

### Seventh Claim for Relief – Breach of Contract
### (Plaintiffs Against Ocwen and U.S. Bank)

144.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

145.    The Note and DOT constitute express contracts between the Plaintiffs and, through assignment, negotiation, or transfer, U.S. Bank and its servicing agent, Ocwen.

146.     The Note evidences a debt for the lending of money from the originating lender, New Century, to Plaintiffs, to be repaid in monthly installments through the year 2035 at a 7.9% interest rate, subject to certain, narrowly-defined circumstances whereby those terms might change as to amount.

147.     The DOT operates as security for repayment of the Loan, and is recorded as a first-position lien against the Property in the real property records of Weld County, Colorado.

148.     Under sections 3, 7, and 9 of the Note and sections 1-2 of the DOT, Defendants had a contractual duty to accept Plaintiffs' monthly payments and apply them to the amounts then due and owing for the payment month on the Loan.  Plaintiffs, in turn, had a duty to make monthly payments in compliance with the Note and DOT.

149.     While the Note and DOT provide for the payment of certain fees and expenses incident to servicing of the Loan or upon default, nothing in those documents provides for the wholesale disregarding of and subsequent loss of payments made and received, the loss of $11,953.53 in surplus funds, the placement of payment funds into a bankruptcy suspense account for several months after a bankruptcy discharge so as to create the appearance of a default, the groundless reversal of payments accepted months earlier for no reason, the misrepresentation that payments actually received and supported by documentary evidence simply don't exist, the imposition of default-related fees and expenses because of a sham default, or the refusal to accept ongoing payments, each of which are actions undertaken by the Defendants.

150.     Through the actions described in the preceding paragraph, Defendants materially breached their obligations under the Note and DOT.

151.   Plaintiffs performed their obligations under Note and DOT, or attempted to perform those obligations but were prevented from performing by virtue of Defendants' wrongful acts identified in paragraph 149.

152.   Plaintiffs suffered injuries, damages, and losses as a result of Defendants' material breaches of the Note and DOT in the form of (a) being forced to forgo a refinance loan with more favorable terms; (b) being forced to choose between losing their home, along with all the money paid towards the Loan since origination, and accepting a proposed modification that includes less favorable terms than the original Loan; (c) incurring substantial fees, costs, and other financial penalties resulting from Ocwen's erroneous accounting; and (d) lost rental income for a second dwelling on the Property.

### Eighth Claim for Relief – Intentional Infliction of Emotional Distress
### (Plaintiff Bryan Friberg Against Ocwen)

153.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

154.   Ocwen engaged in extreme and outrageous conduct by, over a period of several years, (a) failing to properly credit and apply payments made on the Loan; (b) providing Bryan with account statements and other records that contradicted Ocwen's own allegations of a default on the Loan; (c) threatening to foreclose on the Property even after being repeatedly notified that its records were inconsistent and contradictory; (d) attempting to force Bryan into executing a backdated loan modification agreement or otherwise lose his home, and (e), with knowledge of the importance of the family home to the average borrower's finances and emotional well-being, continuing to intentionally service thousands of loans, such as the Plaintiffs' with actual

knowledge or reason to know that its systems, records, and personnel were incapable to keeping accurate records, thereby leading to sham defaults and misleading communications to borrowers.

155.    Ocwen knew that Bryan was uniquely susceptible to suffering extreme emotional distress, because (a) it knew Bryan suffered from PTSD and (b) he had been through a long series of stressful events resulting from Ocwen's misleading and inaccurate statements and actions relating to the Loan.

156.    Ocwen acted with the intent of causing Bryan severe emotional distress or with reckless disregard as to whether its conduct would cause him to suffer severe emotional distress.

157.    Ocwen's extreme and outrageous conduct caused Bryan to suffer severe emotional distress and other damages in an amount to be proven at trial.

## V.    PRAYER FOR RELIEF

Plaintiffs, and each of them, respectfully request that the Court enter judgment in their favor and against each of the Defendants on all claims for relief, award monetary relief in an amount to be proven at trial, and award non-monetary relief, as set forth below:

1.    Economic damages;

2.    Non-economic damages for emotional distress, mental anguish, and inconvenience;

3.    Consequential damages;

4.    Special damages for lost profits and expenses incurred in connection with the Denver branch;

5.    Attorneys' fees as allowed by law;

6.    Pre and Post-judgment interest;

7.    Treble damages;

8.      Statutory Damages; and

9.      Such other and further equitable relief as the Court deems just and proper.

## VII.   JURY DEMAND

Plaintiffs demand a trial to a jury of no less than six on all issues so triable pursuant to

C.R.C.P. 38(b).

Dated February 22, 2017.

Respectfully submitted,

THE LAW OFFICE OF IAN T. HICKS LLC


By_____*s/ Ian T. Hicks*_____
    Ian T. Hicks
    *Original Signature on File at The Law Office of*
    *Ian T. Hicks LLC*

Plaintiffs' Address:

27547 County Road 18, Keenesburg, Colorado, 80643